1
2
3
4
5

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLEN STERN, | Case No. 1:24-cv-00064-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| MARTIN O'MALLEY, Commissioner of Social Security, | |
| Defendant. | (Doc. 1) |
| _____/ | |

## I.     INTRODUCTION

Plaintiff Ellen Stern ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II.     BACKGROUND

On May 21, 2021, Plaintiff protectively filed an application for DIB payments, alleging she became disabled on January 28, 2020, due to positional orthostatic tachycardia syndrome ("POTS"). (Administrative Record ("AR") 19, 77, 95, 251.)  Plaintiff was born on June 11, 1980, and was 39 years old on the alleged onset date.  (AR 76, 94, 247, 287, 308.)  She has completed some college

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (*See* Doc. 13.)

and has past work as a paramedic, firefighter, salesperson, hostess, and customer service representative.  (AR 28, 29, 45, 46, 251, 263.)

**A.      Relevant Medical Evidence of Record[2]**

Plaintiff presented to her primary care physician Patrick M. Yaffee, M.D., in April 2020, complaining of persistent headache following an injury.  (AR 366–69.)  She reported being able to do yoga following the injury.  (AR 366.)

In May 2020, Plaintiff reported to Dr. Yaffee that she was worried she had contracted COVID-19, but in March 2021 she indicated during a physical therapy evaluation that she had "tested negative for antibodies."  (AR 359, 370.)  In June 2020, Plaintiff told Dr. Yaffee that she "works as a [m]edic" and was "treating multiple protestors [one] week ago."  (AR 374.)  She also reported helping care for her ex-husband who was being treated for multiple myeloma and had undergone a bone marrow transplant.  (AR 374.)

Plaintiff presented to Dr. Yaffee in September 2020 with concerns of a learning disability.  (AR 381–84.)  She reported having been diagnosed with attention deficit disorder ("ADD") and dyscalculia as a child.  (AR 381, 384.)  She complained that she has "a lot of difficulty with math," that she "has needed testing accommodations for this," and that she is "currently doing her classes through Oregon State."  (AR 381.)  According to Plaintiff, Oregon State told her she "needs to provide proof of her diagnosis and they will make appropriate accommodations."  (AR 384.)  Dr. Yaffee referred Plaintiff to a psychologist.  (AR 384.)

Plaintiff presented for a follow up appointment with Dr. Yaffee in January 2021.  (AR 385–90.)  She reported that she "follows with an Acupuncturist for her anxiety," that she has "not had good outcomes with therapists in the past," that she has "seen a Psychiatrist in the past," and she has "tried several medications  . . . and got side effects with each."  (AR 386.)  That same month, Plaintiff presented to a cardiology clinic, where she reported she is "studying for a PhD program in Plant Medicine."  (AR 1565.)

In March 2021, Plaintiff presented for a rheumatology consultation.  (AR 430–34.)  She

---

[2] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

reported a history of "borderline personality."  (AR 431.)  That same month, Plaintiff complained to Dr. Yaffee of fatigue and poor concentration and requested that he complete a form "to allow her school program to make adjustments to help with her difficulties."  (AR 459.)

In June 2021, Plaintiff presented for a follow up appointment to Dr. Yaffee, indicating that she had been diagnosed with POTS. (AR 590–94.)  She reported that she was "diagnosed with ADD in the past but re-evaluation showed that she does not have ADD."  (AR 590.)  That same month, Plaintiff reported to Dr. Yaffee that her physical therapist "recommended a mobility assist device (specifically a walker)."  (AR 610.)

In August 2021, Plaintiff reported that she was a "full-time student studying botany."  (AR 1133.)  Plaintiff reported to her cardiovascular consultant in September 2021 that she had been walking two miles a day.  (AR 1153.)

In November 2021, Plaintiff noted to her rheumatologist Tamara Dahhan, M.D., that Plaintiff's insurance "was running out at the end of the month" and that she did "not know if she will be able to do PT session[s] but would be open to getting an order."  (AR 1194, 2532.)  Dr. Dahhan discussed the "possibility of superimposed fibromyalgia" and advised Plaintiff she "can consider use of Gabapentin in the future."  (AR 1197.)

Plaintiff complained of shortness of breath January 2023, and reported to the provider that she "works as a traumatic counselor."  (AR 1912.)  She also indicated that she been diagnosed with "long covid."  (AR 1912.)  She reported that she was using a recumbent bike, walks three miles a day, does Pilates, and was "not limited in exercise."  (AR 1912.)

In March 2023, Yoshimi Miyazaki prepared a letter indicating she had seen Plaintiff "from August 8, 2021, until July 22, 2022."  (AR 1917.)  She wrote, "I believe her life would improve if she were to obtain disability status."  (AR 1917.)

**B.     Plaintiff's Statements**

In July 2021, Plaintiff completed a "Disability Report."  (AR 250–57.)  She stated she stopped working on January 28, 2020, due to her conditions.  (AR 251.)  When asked to "[c]heck the highest grade of school completed," Plaintiff selected "4 or More Years of College."  (AR 251.)

Plaintiff completed an "Adult Function Report" in August 2021.  (AR 279–86.)  Plaintiff

stated that she lives with her boyfriend.  (AR 279.)  She described her condition as "based in the autonomic nervous system," causing tachycardia, and Ehlers-Danlos syndrome, causing osteoarthritis and hyper mobility.  (AR 279.)  She explained that she is "dizzy much of the time", that "prolonged sitting and standing become uncomfortable" and that heavy lifting as well as "rapid change in posture" aggravates her condition.  (AR 279.)  She also stated she has been "diagnosed with dissociative disorder, making focus and stress difficult to deal with."  (AR 279.)  When asked what kinds of things she does on an average day, Plaintiff responded that she studies, reads, does physical therapy, or walks if she is able (using a cane to stay steady as needed) and lies down between tasks.  (AR 280.)  She cares for her daughter on the weekends.  (AR 280.)  Regarding personal care, Plaintiff reported needing to sit to shower, rarely brushing her hair, never shaving, and that most tasks "feel[] insurmountable on most days but [she] can do the minimum."  (AR 280.)  She reports that as hobbies she reads, studies, and grows flowers and vegetables with help, and does these things on a weekly basis "very well."  (AR 283.)

In October 2021, Plaintiff called by a claims communicator and advised that no consultative examination was needed.  (AR 79.)  She reported that she was "currently enrolling in college, majoring science, and trying to finish her master[s] degree."  (AR 79.)  She also reported that her history of PTSD was "not a thing anymore" and she is "prevented from working due to physical only."  (AR 79.)

**C.     Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on October 20, 2021, and again on reconsideration on June 30, 2022.  (AR 19, 117–21, 128–33.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 134–50.)  At the hearing on March 7, 2023, Plaintiff appeared with counsel by videoconference and testified before an ALJ as to her alleged disabling conditions.  (AR 41–69.)

**1.     Plaintiff's Testimony**

Plaintiff testified that she has not completed her college education and was never in a Ph.D. program.  (AR 44–45.)  She lives with her husband and 11-year-old daughter.  (AR 45.)  According to Plaintiff, the last time she did "any type of work" was January 2020.  (AR 45–46.)

1      Plaintiff testified at the hearing that approximately two years prior she spent "two and a half

2  months in an intensive trauma program for trauma therapy" where she was diagnosed with

3  dissociative disorder and was treated for PTSD  (AR 49–50, 52.)  She stated that "insurance stopped

4  paying" for the program, after which she recently began seeing a new therapist, Cindy Brooks.  (AR

5  50.)  She pays out of pocket.  (AR 50.)  Plaintiff testified that before seeing Ms. Brooks, she was

6  seeing Yoshimi Miyazaki, an "emotional intelligence coach," in 2022.  (AR 51–52.)  She has not

7  been prescribed any mental health medications.  (AR 52.)

8      Plaintiff testified that she feels like she is going to faint if she changes positions too quickly

9  or makes sudden movements.  (AR 53.)  She stated that she walks three miles a day as part of her

10  physical therapy, otherwise she is in pain.  (AR 54–55.)  She testified that she has ongoing

11  symptoms of carpal tunnel syndrome, such as circulatory issues.  (AR 55–56.)  Plaintiff reported

12  that her joints pop out of socket, and she has difficulty gripping and grasping items.  (AR 59.)  For

13  example, she testified that she dropped a pan that morning and often drops her phone.  (AR 58–59.)

14  Her husband pushes her joints back into the socket to alleviate pain.  (AR 59.)

15      Plaintiff testified that she has been diagnosed with fibromyalgia by Dr. Tamara Mahood, and

16  received trigger point injections, which were ineffective.  (AR 59–60.)  She does not take pain

17  medications, only an anti-inflammatory.  (AR 60.)  She testified that she feels "unsteady most of

18  the time" and uses a cane for balance about once a week.  (AR 64.)  The cane was recommended,

19  not prescribed, and her physical therapist taught her how to use it.  (AR 64.)  Plaintiff testified she

20  is in pain every day, and 20-percent of the week her pain level is 8/10.  (AR 66.)  According to

21  Plaintiff, she does not get along with people.  (AR 65–66.)

22      **2.      Vocational Expert's Testimony**

23      A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a

24  paramedic, firefighter, salesperson, and a customer service representative.  (AR 69–70.) The ALJ

25  asked the VE to consider a person of Plaintiff's age, education, and past work history. (AR 70.) The

26  VE was also to assume this person can perform a full range of light work activities, with the

27  following limitations: precluded from all ladder, rope, and scaffold climbing; precluded from all

28  exposure to dangerous work hazards, which include unprotected heights, and exposed moving

machinery; limited to performing the remaining postural motions occasionally; limited to having occasional exposure to extreme heat, humidity, and cold conditions; limited to occasional overhead reaching tasks with the bilateral upper extremities; limited to frequent, but not constant, bilateral upper extremity forward reaching, handling, and fingering tasks; limited to routine, simple work tasks, work that does not require a fast assembly quota pace, i.e., a fast assembly line environment where someone's work impacts work down the line; and need a work setting allowing for some off-task behavior of up to 3% of the workday.  (AR 70.)

The VE testified that such a person could not perform Plaintiff's past work, but perform other light jobs in the national economy, such as Housekeeping Cleaner, Dictionary of Operational Titles (DOT) code 323.687-014 with a specific vocational preparation (SVP)[3] of 2; and Shipping and Receiving Weigher, DOT code 222.387-074 with an SVP of 2.  (AR 70–71.)  In addition to the foregoing limitations, when adding a requirement to briefly change positions throughout the workday (every 30 minutes for one to two minutes), the VE testified that such a person could not perform the jobs previously identified, but could perform other light jobs such as Cashier II, DOT code 211.462-010 with an SVP of 2; and Battery Inspector, DOT code 727.687-066 with an SVP of 2.  (AR 70–71.)  The VE further testified that if that off task behavior rose to 20% of the workday, there would "be no work available for this individual."  (AR 72.)

**D.    The ALJ's Decision**

In a decision dated May 22, 2023, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 19–31.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520.  (AR 21–31.)  The ALJ decided that Plaintiff met the insured status requirements of the Act through December 31, 2025, and she had not engaged in substantial gainful activity since January 28, 2020, the alleged onset date (step one).  (AR 21.)  At step two, the ALJ found Plaintiff had the following severe impairments: POTS; degenerative disc disease of the cervical and lumbar spines; carpal tunnel syndrome with release surgeries; mild chronic cervical radiculopathy; and

---

[3] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

Ehlers-Danlos syndrome.  (AR 21–22.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 22–23.)

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[4] and applied the assessment at steps four and five.  *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined Plaintiff had the RFC:

> to perform a full range of light work as defined in 20 CFR [§] 404.1567(b), with the following additional limitations.  [Plaintiff] needs a position change opportunity as often as every 30 minutes for 1-2 minutes.  [Plaintiff] is precluded from all ladders, ropes, and scaffolds climbing, and all dangerous work hazards exposure, and is limited to performing the remaining postural motions occasionally.  [Plaintiff] is limited to having occasional exposure to extreme heat, humidity, and cold conditions.  She is limited to occasional overhead reaching tasks with the bilateral upper extremities, and frequent, but not constant, forward reaching, handling, and fingering tasks with the bilateral upper extremities.  She is limited to routine, simple tasks, work not requiring a fast assembly quota pace (i.e., fast assembly line environment where one's work impacts work down the line), and work allowing for some off-task behavior of up to 3% of the workday due to momentary symptom distractions.

(AR 23–28.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" they rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. . . ."  (AR 24.)  The ALJ determined that Plaintiff was unable to perform her past relevant work (step 4), but was not disabled because, given her RFC, she could perform a significant number of other jobs in the national economy, specifically Cashier II and Battery Inspector (step 5).  (AR 28–31.) The ALJ concluded Plaintiff was not disabled at any time from

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  *See* TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id*.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006).

1   January 28, 2020, through the date of their decision.  (AR 31.)

2          Plaintiff sought review of this decision before the Appeals Council, which denied review

3   on November 8, 2023.  (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the

4   Commissioner.  20 C.F.R. § 404.981.

5                              **III.       LEGAL STANDARD**

6   **A.     Applicable Law**

7          An individual is considered "disabled" for purposes of disability benefits if they are unable

8   "to engage in any substantial gainful activity by reason of any medically determinable physical or

9   mental impairment which can be expected to result in death or which has lasted or can be expected

10  to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  However,

11  "[a]n individual shall be determined to be under a disability only if [their] physical or mental

12  impairment or impairments are of such severity that [they are] not only unable to do [their] previous

13  work but cannot, considering [their] age, education, and work experience, engage in any other kind

14  of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

15         "The Social Security Regulations set out a five-step sequential process for determining

16  whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*, 180

17  F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The Ninth Circuit has provided the

18  following description of the sequential evaluation analysis:

19              In step one, the ALJ determines whether a claimant is currently engaged in
                substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ
20              proceeds to step two and evaluates whether the claimant has a medically severe
                impairment or combination of impairments.  If not, the claimant is not disabled.  If
21              so, the ALJ proceeds to step three and considers whether the impairment or
                combination of impairments meets or equals a listed impairment under 20 C.F.R. pt.
22              404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If
                not, the ALJ proceeds to step four and assesses whether the claimant is capable of
23              performing her past relevant work.  If so, the claimant is not disabled.  If not, the
                ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to
24              perform any other substantial gainful activity in the national economy.  If so, the
25              claimant is not disabled.  If not, the claimant is disabled.

26  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  "If a claimant is found to be 'disabled' or

27  'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Tackett*,

28  180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

                                              8

1   "The claimant carries the initial burden of proving a disability in steps one through four of
2   the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).
3   "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to
4   the Commissioner in step five to show that the claimant can perform other substantial gainful work."
5   *Id.* (citing *Swenson*, 876 F.2d at 687).

6   **B.    Scope of Review**

7        "This court may set aside the Commissioner's denial of [social security] benefits [only]
8   when the ALJ's findings are based on legal error or are not supported by substantial evidence in
9   the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence . . . is
10  'more than a mere scintilla,'" and means only "such relevant evidence as a reasonable mind might
11  accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)
12  (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Ford v. Saul*, 950 F.3d
13  1141, 1154 (9th Cir. 2020).

14       "This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec.
15  Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by
16  inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th
17  Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when
18  the evidence is susceptible to more than one rational interpretation." *Id*.; *see, e.g.*, *Edlund v.
19  Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one
20  rational interpretation, the court may not substitute its judgment for that of the Commissioner."
21  (citations omitted)).

22       Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a
23  specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*,
24  143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole,
25  weighing both evidence that supports and evidence that detracts from the [Commissioner's]
26  conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

27       Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."
28  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.     DISCUSSION

Plaintiff asserts that the ALJ failed to articulate clear and convincing reasons for discounting Plaintiff's testimony.  (*See* Doc. 12 at 7–9.)  Plaintiff further contends that the ALJ failed to evaluate properly Plaintiff's use of a cane and erred by not resolving a conflict between the VE's testimony, the DOT, and Plaintiff's RFC.  (*See id*. at 10–11.)  The Court takes each argument in turn and concludes that remand is not warranted in this case.

**A.     The ALJ Did Not Err in Discounting Plaintiff's Testimony**

**1.     Legal Standard**

In evaluating the credibility of a claimant's testimony, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id*.  The claimant is not required to show that [their] impairment "could reasonably be expected to cause the severity of the symptom [they have] alleged; [they] need only show that it could reasonably have caused some degree of the symptom."  *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if they give "specific, clear and convincing reasons" for the rejection.[5]  *Id*.  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course

---

[5] The Court rejects the Commissioner's suggestion that a lesser standard of review may apply.  (*See* Doc. 18 at 5 n.4.)

1

of treatment; and (3) the claimant's daily activities.   If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

2

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v.*

3

*Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009).  Other factors the ALJ may

4

consider include a claimant's work record and testimony from physicians and third parties

5

concerning the nature, severity, and effect of the symptoms of which they complain.  *Light v. Social*

6

*Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

7

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most

8

demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir.

9

2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

10

General findings are not enough to satisfy this standard; the ALJ "'must identify what testimony is

11

not credible and what evidence undermines the claimant's complaints.'"  *Burrell v. Colvin*, 775

12

F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

13

**2.     Analysis**

14

As noted above, the ALJ found Plaintiff's impairments "could reasonably be expected to

15

cause the alleged symptoms," but rejected Plaintiff's subjective testimony as "not entirely consistent

16

with the medical evidence and other evidence in the record . . . ."  (AR 24.)  Since the ALJ found

17

Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged

18

symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing

19

reasons" for Plaintiff's adverse credibility finding.  *See Vasquez*, 572 F.3d at 591.

20

Had the ALJ's statement that Plaintiff's subjective testimony was inconsistent with the

21

medical record been the end of discussion, Plaintiff's argument that the ALJ "fails to articulate

22

substantial evidence to support the ALJ's rationale for not fully crediting Plaintiff's subjective

23

complaints" (Doc. 12 at 8) might have merit.  However, the ALJ continued the analysis, providing

24

at least three valid reasons for discrediting Plaintiff's testimony.

25

**a.     Treatment History**

26

First, the ALJ observed that there is "very little medical evidence of record in 2022."  (AR

27

26.)  "An ALJ may properly discount a plaintiff's credibility based on an unexplained failure to seek

28

treatment consistent with the alleged severity of the subjective complaints."  *Bunnell v. Sullivan*, 947

F.2d 341, 346 (9th Cir. 1991). Plaintiff does not dispute the dearth of treatment records from 2022 but explains that her "insurance was running out." (Doc. 12 at 8.) While Plaintiff did report to her rheumatologist that her insurance was "running out" at the end of November 2021, the statement was made in relation to continuing physical therapy. (*See* AR 1194 (Plaintiff does "not know if she will be able to do PT session[s] but would be open to getting an order.").) A lack of insurance to continue physical therapy sessions does not explain the absence of other treatment records for the physical impairments alleged, such as from her treating neurologists or her primary care physician Dr. Yaffee. In fact, the record shows that a lack of insurance did not prevent Plaintiff from seeking treatment from her cardiologist and rheumatologist the few times she did so in 2022. (*See* AR 26 (citing AR 2420–72, 2539–41).)

A lack of insurance also does not explain Plaintiff's lack of mental health treatment records in 2022—or at any time during the relevant period. The only "evidence" of such treatment Plaintiff cites is her own self-reports and testimony. (*See* Doc. 18 at 8 (citing AR 386 (Plaintiff's statement that she "follows with an Acupuncturist for her anxiety" and has "seen a Psychiatrist in the past"); AR 50 (Plaintiff's hearing testimony that she recently began seeing Cindy Brooks, a new therapist)).) The record contains no treatment documentation from an acupuncturist or Ms. Books (or any other mental health provider) despite (a) Plaintiff's counsel's representation that mental health treatment records from 2022 were "in the file" (AR 52–53) and (b) the ALJ holding the record open to obtain additional evidence that was outstanding at the time of the hearing (AR 19; *see also* AR 74).[6]

In the absence of any justification for the gap in Plaintiff's physical treatment record—or for her lack of mental health treatment records altogether—the ALJ was entitled to discount Plaintiff's credibility on this basis.

---

[6] Plaintiff's primary care physician Dr. Yaffee referred her to a psychiatrist for an evaluation relating to her allegations of learning disability (AR 384), but it does not appear she ever followed through with that referral. (*See* AR 27.) In addition, she testified at the hearing that, prior to seeing Ms. Brooks, she was treated by Yoshimi Miyazaki, an "emotional intelligence coach." (AR 51–52.) There are no treatment notes by Ms. Miyazaki in the record, only a letter prepared in March 2023 indicating that she had seen Plaintiff "from August 8, 2021, until July 22, 2022" and expressing her belief that "her life would improve if she were to obtain disability status." (AR 1917.) The ALJ considered the letter and deemed it "wholly unpersuasive" (AR 28), a finding that Plaintiff does not challenge.

### b.    Inconsistent Statements

Another reason the ALJ discredited Plaintiff's testimony was because they found she had made inconsistent statements about her medical history, functional limitations, and work history. (AR 27.)  Plaintiff does not address this finding, or the conclusion drawn therefrom, in her briefing.

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning symptoms, and other testimony by the claimant that appears less than candid." *Smolen*, 80 F.3d at 1284.  Plaintiff claimed prior diagnoses of COVID-19 (AR 370, 1912), fibromyalgia (AR 59–60), PTSD (AR 49–50, 52), ADD (381, 384, 590), and dissociative disorder (AR 49–50, 52, 279), but the evidence, at best, does not substantiate these claims (*see* AR 27), and, at worst, undermines them (*see* AR 359 (Plaintiff reported she "tested negative for [COVID-19] antibodies"); AR 1197 (Rheumatologist Dr. Tamara Dahhan discussed the "***possibility*** of superimposed fibromyalgia") (emphasis added); AR 79 (Plaintiff reports that her "history of PTSD" is "not a thing anymore"); AR 590 (Plaintiff reports that a "re-evaluation showed that she does not have ADD"); AR 79 (Plaintiff reports that she is "prevented from working ***due to physical only***.") (emphasis added).)  Plaintiff also told her primary care physician Dr. Yaffee that her physical therapist "recommended a mobility assist device (specifically a walker)" (AR 610), but there is no evidence that a physical therapist—or anyone else—recommended that Plaintiff use a walker.

Plaintiff also made inconsistent statements about when she stopped working. In her "Disability Report," Plaintiff indicated that the last time she worked was January 2020.  (AR 251.) Plaintiff repeated this claim at the hearing.  (AR 45–46 (The last time Plaintiff did "any type of work" was January 2020).)  As the ALJ noted, Plaintiff, however, told her primary care physician Dr. Yaffee in June 2020 that she "works as a [m]edic" and was "treating multiple protestors [one] week ago."  (AR 374.)  In January 2023, Plaintiff reported to another provider that she "works as a traumatic counselor."  (AR 1912.)

These types of unsubstantiated and inconsistent statements comprise a clear and convincing reason to discount Plaintiff's credibility, and Plaintiff does not contend otherwise.  *See Smolen*, 80 F.3d at 1284.  *See also, e.g.*, *Denham v. Astrue*, 494 F. App'x 813, 815 (9th Cir. 2012) (affirming a

credibility finding that relied, in part, on two years of part-time janitorial work after the alleged onset date); *Alonzo v. Colvin*, No. 1:14–cv–00460–SKO, 2015 WL 5358151 at *17 (E.D. Cal. Sept. 11, 2015) (affirming discount by the ALJ of Plaintiff's credibility due to inconsistent statements); *Archuleta v. Colvin*, No. CV 12–04486–MAN, 2013 WL 6002096, at *9 (C.D. Cal. Nov. 8, 2013) ("[P]laintiff's ability to work after the alleged onset date [gave] rise to a reasonable inference that plaintiff's subjective pain [was] not as restrictive as she allege[d] it to be.").

### c.    Activities of Daily Living

Finally, the ALJ was "most persuaded" by Plaintiff's reported capabilities and activities of daily living, which undermine her claims of extreme limitations.  (AR 27–28.)  Plaintiff alleges that she feels dizzy and unsteady most of the time, is in pain every day, and most daily tasks "feel insurmountable."  (AR 53, 64, 66, 279, 280.)  Yet, as discussed by the ALJ, the record contains reports of Plaintiff's ability to study (AR 280, 283, 1133, 1565), grow flowers and vegetables "very well" (AR 283), read (AR 280, 283), do yoga (AR 366), do Pilates (AR 1912), walk two and three miles per day (AR 54–55, 1153, 1912), exercise with no limitation (AR 1912), care for her husband who has cancer (AR 374), and engage in significant college coursework (AR 79, 251, 1133, 1565).

An ALJ may properly consider a claimant's daily activities when evaluating credibility.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (the nature of daily activities may be considered when evaluating credibility).  Specifically, in evaluating a claimant's credibility, an ALJ may consider inconsistencies between the claimant's testimony and the claimant's conduct and whether the claimant engages in daily activities inconsistent with the alleged symptoms.  *Molina*, 674 F.3d at 1112.

The Court finds that the above-described activities tend to suggest, as the ALJ concluded, that Plaintiff may still be able to perform, on a sustained basis, the basic demands of the representative occupations identified by the ALJ (*see* AR 30).  *See Fair*, 885 F.2d at 603 (finding that if a claimant has the ability to perform activities "that involved many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent her from working"); *see also, e.g., Stubbs-Danielson*, 539 F.3d at 1175 (finding that the ALJ sufficiently explained their reasons for discrediting the claimant's testimony because

the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband managing finances); *Morgan*, 169 F.3d at 600 (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility); *Kelly v. Astrue*, 471 F. App'x 674, 677 (9th Cir. 2012) (holding that ALJ properly made an adverse credibility finding because, in part, claimant's daily activities included driving, washing the dishes, shopping, and caring for her two children); *Nelson v. Colvin*, No. 1:15-cv-00696-SKO, 2016 WL 3407627, at *20 (E.D. Cal. June 20, 2016) (ALJ properly discredited subjective complaints of claimant who suffered from chronic back problems where claimant engaged in activities such as preparing simple meals, washing dishes, driving a car, shopping for groceries and household supplies 2–3 times a week, walking up to a mile, using a computer for about half an hour at a time, visiting with family, mopping and vacuuming, independently handling her own finances, and doing yoga tapes at home.).

Plaintiff does not dispute that she performs the above-described activities. Instead, she first asserts that the ALJ "adamantly described Plaintiff has having finished college, despite testimony to the contrary." (Doc. 12 at 8 (citing AR 29, 44–45.) The ALJ made no such description. Instead, the ALJ found that Plaintiff "has at least a high school education," and then cited to the "Disability Report," in which ***Plaintiff herself*** indicated that she had completed "4 or More Years of College." (AR 19 (citing AR 251).) Plaintiff also faults the ALJ for "fail[ing] to acknowledge that, over and over in the [Adult Function Report], Plaintiff explained that she could complete only some of the tasks in a single day and regularly needed to use a cane or take breaks." (Doc. 12 at 9.) While Plaintiff did note in the Adult Function Report that she needs to use a cane to stay steady while walking and to lie down between tasks (*see* AR 280), elsewhere in the Report she indicated she performs her daily hobbies "very well." (AR 283.) Moreover, Plaintiff did not include any such qualifications on her abilities when reporting them to her treating physicians (*see* AR 366, 374, 1133, 1153, 1565, 1912). In fact, on at least one occasion, Plaintiff reported having no limitation on exercise at all. (AR 1912.) But even were there to be some difficulty performing the activities, they are grounds for discrediting Plaintiff's testimony to the extent that they, as here, contradict claims

of a totally debilitating impairment.  *Molina*, 674 F.3d at 1113.

The ALJ's decision recognized that Plaintiff has some work limitations because of impairments.[7]  (*See* AR 28 (including additional physical and mental limitations than those opined by the consulting physicians, in view of her ongoing symptoms and her allegations).)  The Court concludes that the ALJ properly discredited Plaintiff's testimony that her limitations render her ***completely*** unable to work, however, based on her activities of daily living  *Fair*, 885 F.2d at 604; *see also Bunnell*, 947 F.2d at 346 ("So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence.").

In sum, the Court finds the ALJ discounted Plaintiff's testimony for at least three clear and convincing reasons supported by substantial evidence.  Where, as here, the ALJ makes a reasonable interpretation of Plaintiff's testimony, it is not the Court's role to second-guess it.  *Rollins*, 261 F.3d at 857 (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all the activities and noting that the ALJ's interpretation "may not be the only reasonable one").  *See also Ford*, 950 F.3d at 1159 ("Our review of an ALJ's fact-finding for substantial evidence is deferential").

**B.      The ALJ Had No Obligation to Evaluate Plaintiff's Use of a Cane**

Plaintiff contends that, despite her reported use of a cane for stability, the ALJ "failed to discuss and assess whether Plaintiff needed a cane in contradiction of SSR 96-9p."  (Doc. 12 at 10.)  However, SSR 96-9p instructs for an ALJ "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work—Implications of a Residual Functional

---

[7] Despite bearing the burden of proving her disability, Plaintiff does not specify what additional functional limitations resulting from his impairments were not accounted for in the ALJ's RFC assessment, much less point to any evidence demonstrating that she has limitations greater than those determined in the ALJ's decision.  *See Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (noting that claimant bears burden of proving that she is disabled and must present "complete and detailed objective medical reports of her condition from licensed medical professionals").

1  CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, SSR 96-9p (S.S.A. July 2, 1996),

2  1996 WL 374185.  *See Quintero v. Colvin,* No. 1:13-CV-00478-SKO, 2014 WL 4968269, at *10

3  (E.D. Cal. Sept. 29, 2014) ("The use of a cane or other 'hand-held assistive device' is probative of

4  a claimant's functional limitations only if it is medically required.") (citing SSR 96-9p).

5         Here, Plaintiff has not established that the cane was medically required.  Plaintiff has not

6  and cannot point to any medical evidence in the record establishing the need for a cane or any other

7  assistive device to aid in walking or standing.  It is undisputed that no physician prescribed use of

8  a cane for ambulation or balance.  (AR 64.)  While Plaintiff testified that the cane was

9  "recommended" by her physical therapist (AR 64), there is no evidence substantiating that

10 recommendation.  Plaintiff cites to her statements and notations in the record that she used a cane

11 for stability, but neither her testimony nor an observation in the record that Plaintiff used a cane

12 establishes the requisite medical necessity.  *See Velasquez v. O'Malley*, No. 23-CV-1683-RBM-

13 BLM, 2024 WL 3220726, at *4 (S.D. Cal. June 27, 2024) ("A claimant's own testimony does not

14 constitute the required medical documentation establishing the need for an assistive device.

15 Similarly, the fact that various medical providers noted plaintiff's use of a cane does not establish

16 its medical necessity.") (internal citations omitted).

17        Because there is no documentation in the record establishing that a cane was medically

18 required or describing the circumstances for which it was needed, the Court concludes that the ALJ

19 had no obligation under SSR 96-9p to evaluate Plaintiff's cane use.

20 **C.     The ALJ's Step Five Finding is Harmless Error**

21        Finally, Plaintiff challenges the ALJ's determination that, based on the limitations identified

22 in her RFC, Plaintiff could perform the jobs of Cashier II and Battery Inspector.  (AR 20.)

23 Specifically, as discussed above, the ALJ found that Plaintiff was capable of performing "routine,

24 simple tasks."  (AR 23.)  Plaintiff contends the ALJ's step five assessment conflicts with those

25 findings because the representative jobs identified require a Level Two reasoning or higher.  (*See*

26 Doc. 12 at 10–11.)

27        The VE testified that an individual with the same RFC as Plaintiff could perform the job of

28 Cashier II, DOT code 211.462-010 with an SVP of 2; and Battery Inspector, DOT code 727.687-

066 with an SVP of 2.  (AR 70–71; *see also* AR 30.)  The DOT provides that the job of a Cashier II requires Level Three reasoning, which the DOT defines as ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations." 211.462-010 CASHIER II, DICOT 211.462-010 (2016).

The Court finds that the ALJ erred in determining that Plaintiff could perform the job of a Cashier II given her limitations in the RFC.  *See Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015) ("[W]e join the Tenth Circuit [in *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005)] and hold that there is an apparent conflict between the residual functional capacity to perform simple, repetitive tasks, and the demands of Level 3 Reasoning.  We find the conflict to be plain when we consider, side-by-side, the definitions of Level 2 and Level 3 Reasoning."); *see also Corwin v. Kijakazi*, No. 1:20-CV-00394-GSA, 2021 WL 5771658, at *5 (E.D. Cal. Dec. 6, 2021) (finding conflict exists between Plaintiff's limitation to simple, routine and repetitive tasks and simple work-related decision and the Level Three reasoning requirement of the Cashier II position).  Again, the RFC limited Plaintiff to performing "routine, simple tasks" (AR 23), but the Cashier II position requires Level 3 reasoning, *i.e.*, the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations."

The Commissioner does not dispute the ALJ's error.  Instead, the Commissioner asserts that the error is "at most harmless" because the ALJ's step-five finding is still supported by the remaining representative occupation of Battery Inspector, which requires Level Two reasoning. (Doc. 18 at 14.)  The Court agrees with the Commissioner.

Plaintiff contends the limitation to "routine, simple tasks" is inconsistent with the ability to "understand and carry out detailed written or oral instructions" required by Level Two (Doc. 12 at 11), but she ignores an important aspect of the definition of Level Two reasoning.  Level Two is defined as: the ability to "[a]pply common sense understanding to carry out ***detailed but uninvolved*** written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations."  APPENDIX C - COMPONENTS OF THE DEFINITION TRAILER, 1991 WL

688702 (emphasis added).  *See also* 727.687-066 INSPECTOR, CONTAINER FINISHING, DICOT 727.687-066 (2016) (same).  Courts, including this one, have held that the ability to perform simple, routine, and repetitive tasks is equivalent to Level Two reasoning.  *See Trevino v. Saul*, No. 1:19-CV-00870-SKO, 2020 WL 5633037, at *15 (E.D. Cal. Sept. 21, 2020) ("A limitation to simple, routine tasks is consistent with jobs requiring a reasoning level of two.") (citations omitted); *Coleman v. Astrue*, No. CV 10-5641 JC, 2011 WL 781930, at *5 (C.D. Cal. Feb. 28, 2011) ("The Court recognizes, as defendant points out, that the weight of prevailing authority precludes a finding of any inconsistency between a reasoning level of two and a mere limitation to simple, repetitive tasks or unskilled work.") (collecting cases).  *See also Abrew v. Astrue*, 303 F. App'x 567, 569 (9th Cir. 2008) (holding "there was no conflict between the ALJ's step five determination that Abrew could complete only simple tasks and the vocational expert's testimony that Abrew could do jobs that the U.S. Department of Labor categorizes at 'Reasoning Level 2'").

In sum, the ALJ's finding at step five that Plaintiff could perform the Cashier II job with a Level Three reasoning was harmless error, in light of the other identified occupation, Battery Inspector, which comports with Plaintiff's abilities.  *See Tommasetti*, 533 F.3d at 1038.

### V.        CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of Court is DIRECTED to enter judgment in favor of Defendant Martin O'Malley, Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **September 20, 2024**                    */s/ Sheila K. Oberto*
                                                    UNITED STATES MAGISTRATE JUDGE